The Honorable United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Court is in session. Today's cases will be called as previously announced and the times will be as allotted to counsel. The first case today is United States v. Carlo Manuel Velazquez-Fontanez Appeal No. 181188 United States v. Ruben Cotto-Andino Appeal No. 181215 United States v. Jose D. Resto-Figueroa Appeal No. 182265 and United States v. Carlos Manuel Velazquez-Fontanez Appeal No. 191010. Ms. Ramirez, if you would unmute your microphone and then you may proceed when you are ready. Yes, Your Honor. Good morning. My name is Maria Ramirez de Serra and I am the counsel for appellant Carlos Manuel Velazquez-Fontanez. Your Honor, Mr. Carlos Manuel Velazquez-Fontanez is appealing from the district court's decision denying a Rule 29 motion of acquittal based on the evidence presented in the case. A jury trial found him guilty of five counts charged in the indictment against him, counts related to his alleged participation in the conspiracy and drug dealing involving firearms and drive-by shooting of an organization named La Rompe Uno. As Your Honor knows, based on previous case law, La Rompe Uno is an illegal organization and it was organized in order to have control of drug dealing, drug trafficking, and committing violent crimes including murder in specific projects in the metropolitan area of San Juan. The purpose of their joining was to take more control of the drug distribution in the area. Mr. Velazquez-Fontanez is charged with the overt act of acting occasionally as a runner, this means as a person who delivers drugs to the drug point, and also in aiding and abetting in a drive-by shooting committed on June 25 of the year 2011. Mr. Velazquez-Fontanez is a 30-year-old gentleman. At the time of the fact of the case, he was a police officer for the municipality of Puerto Rico and he had no prior criminal record. We submit, Your Honor, respectfully that the evidence presented, even analyzed and viewed in the light most favorable to the jury verdict didn't prove beyond a reasonable doubt that Mr. Velazquez-Fontanez should be responsible. The government rested on two witnesses, two cooperating witnesses whose names are Jan Jorren Pizarro and Calvino Acevedo. These two witnesses were also involved in the Rompe Uno organization. They were enforcers and they were physically present and intervened directly with the drive-by shooting that is charged to Mr. Velazquez-Fontanez in this case. Both of them pled guilty of the charges and agreed to cooperate with the government in and other cases that this honorable court has reviewed before, such as the cases of Ramirez-Rivera and Rodriguez that was recently resolved in the year 2019. Ms. Ramirez, if we assume for a moment that the jury believed the two cooperating witnesses, then wasn't that, wouldn't there have been sufficient evidence? Okay, Your Honor, our position is that the evidence presented regarding the drive-by shooting was not enough to prove beyond a reasonable doubt that Mr. Velazquez-Fontanez to commit the crime. The only evidence presented in this case in that regard was from Mr. Jan Jorren Pizarro, who allegedly claimed that he was in a meeting at Cuija's house. Cuija was one of the runners for the organization and was one of the runners for Bebo a drug point. Bebo happens to be Mr. Velazquez-Fontanez's brother, and based on the testimony of these two witnesses, they didn't even know Mr. Velazquez-Fontanez by name. They knew him by Bebo's brother. Why? Because Bebo had drug points in the metropolitan area and he was also a known member of La Rompe Uno. So their knowledge of Mr. Velazquez-Fontanez was because of the relationship of Mr. Velazquez-Fontanez with this person named Bebo. The drive-by shooting allegedly occurred while these witnesses were at Cuija's house, going back to Cuija, he was one of the runners. And Cuija received a phone call from Bebo. Bebo was telling him that this person named Elvin Barcalcel-Martinez was trying to take away the drug points from him, the drug points that belonged to him. And he was coming from jail because he was serving time in prison for a case of murder. And he informed Mr. Cuija, the one who was taking the phone call, he informed him that Mr. Elvin Barcalcel-Martinez, also known as Prieto, was washing cars in front of a business named El Vente Business in the Tortugo area of San Juan. So Cuija informed Mr. Janjorro and also Mr. Calvino Aperedo, who happened to be there, and the other gang members of what Bebo told him in the phone call. Immediately Janjorro responded, that's something that deals with me personally, because that's something that belongs to Bebo. Like saying, it's something that is not related to us. So we need the authorization of one of the leaders of the organization, who happens to be Luis Alicia Colón, also known as Prensa. Excuse me, did one of the cooperating witnesses say that your client was the one who pointed out, told them which one was Prieto Pincho? Yes, your honor. It's a little bit different and it's a matter of speculation, respectfully, in concluding that he identified Prieto. What happened was that with the information that Bebo gave to Cuija, they all went to an authorized, and after getting the authorization from Prensa, the Rompeluno leader, they all went to the area, to the Tortugo ward. And when they were already there, Janjorro testified that he called Cuija to ask him for Mr. Velazquez Fontane's phone number, and he gave it to him. And Janjorro called Mr. Velazquez Fontane, and the only thing that Mr. Janjorro was, they are there, he is the one, he is the big guy who is speaking over the phone. Judge Kayada, follow-up questions? None, thank you. Judge Thompson, do you have any additional questions? I'm all set, thank you. Thank you, Ms. Ramirez. We'll hear from Mr. Novas now. Good morning, again, in representation of Juven Coto Andino. The central question presented by Mr. Coto Andino's appeal is really whether any confidence can be accorded to the jury's verdict given the fact that the government's case relied mostly on a mosaic of unfairly prejudicial extrinsic evidence of prior bad acts, some actually occurring over 15 years prior to the commencement of the conspiracy. And there was evidence Mr. Coto was not allowed to impeach. That's a separate issue. Now, in this case, it's important to understand that the government had a very weak case, and that's why it had to resort to this kind of extrinsic evidence of very remote acts. The government's sole piece of evidence to prove that Mr. Coto engaged in the drug trafficking enterprise that he was charged with was a testimony of one cooperating co-defendant who testified that he would hear others at the drug point say, hey, don't forget Ruben's ticket. That statement purportedly proved that Mr. Coto received some form of a fee for letting other people operate the drug point at the public housing project where he lived. And that was per the indictment. That's exactly what was charged against him, specifically that he had some form of a rental agreement going on. Now, the government realizing that evidence-wise, this may not be enough for the jury to convict, basically resorted over what we think was not intrinsic to the conspiracy proven up with incompetent evidence. Specifically, this was the evidence of the two remote murders supposedly perpetrated by Mr. Coto Andino in the mid-1990s, at least 15 years prior to the beginning of the conspiracy. So that was the showcase piece of evidence that the government had against Mr. Coto Andino. Basically, and when we say it was unfairly prejudicial, was because, number one, the evidence of these extremely remote murders was uncorroborated testimony of a co-defendant. These alleged bad acts were wholly unsubstantiated in any way. It was uncharged conduct. The was murdered or when. Obviously, Mr. Coto objected, but the court eventually admitted these prior remote murders as probative, perhaps, of opportunity to participate in the crime. In this sense, we believe the court abused its discretion because these bad acts were too remote to be probative of anything. And even if they could be deemed marginally probative for any of the reasons that the government propounds, the risk of unfair prejudice was clearly outweighed by the slim probative value that this evidence had, likely to be taken as propensity evidence by the jury. So under 403, it should have been likewise excluded. Why do we say that this evidence was unfairly prejudicial? Upon its face, first of all, we are talking about not one but two murders, terrible acts of violence that the jury could easily receive as propensity evidence or for some other improper purpose, notwithstanding limiting instructions. These were murders which, in the end, were uncorroborated. So they were uncharged. Mr. Coto had basically had to defend of a ghost. There was no way he could defend from these wholly If I can ask you a question, did the government attempt to tie the murders that you are complaining about now having been admitted to control over the same drug points that are involved in this case? Or are they different drug points? Do you know whether the government tried to tie them as the same drug points? Yes, your honor. That is a fair question. What the government developed was a narrative with the purpose of tying those remote murders to actual events occurring 15 years later. We believe that they failed in having a logical connection. So the answer is yes, the government did attempt to do that. But there were intervening circumstances between the early 1990s and when this conspiracy began over 15 years later that would really break any logical inference or any kind of possible relevancy. For instance, there was evidence of gainful employment on the part of Mr. Coto over substantial periods of time. We brought a trial certification from the social security that showed tax withholdings from legitimate employment beginning, if we're not mistaken, in the year 1993 through the year 2013. So yes, the government attempted to do that, but it did so unfairly and it resorted to this evidence under the guise of some kind of relevancy, basically disguising propensity evidence. Just to put a pinpoint on it, getting back to Judge Howard's question, was it allegedly the same point? Because the intervening circumstances doesn't mean that he didn't continue to operate a drug point even though he may have been legitimately employed or receiving some other kinds of benefits. Yes, these purported murders took place in one of the housing projects that are object of the indictment and where these things happen and where it was said that Mr. Ruben Coto was said to have a rental agreement. The answer is yes. According to the testimony of that witness, which brings us to a second point. Our hands were tied to impeach this witness. Not only did this witness come with stories of bygone eras, we were not allowed to impeach this witness on non-collateral matters. Specifically, this witness was adamant that this murder occurred no later than 1996. We had evidence, Your Honor. We tried to bring evidence in various ways that the murder of one of those individuals, aka Cano Ingram, happened in the year 2001. We don't have to repeat the long list of things we proffered. We could, if Your Honor asks, but we had competent evidence to show this non-collateral issue. We were not allowed to do that, which undermines the confidence. Could you pause on that for a second? As I understand it, the witness testified to two murders. One of them, he referred to a guy as Cano Ingram, was a person who was killed. You wanted to put on evidence from, I think, a lawyer or someone else that a person named Cano Ingram was killed in a different year. Yes, sir. As I understand it, the court's concern about that was that it said Cano Ingram is a nickname that is very common, so you haven't established the premise of your impeachment, which is that the lawyer and the witness were referring to the same person. What the trial judge actually ruled is that we could not prove that the decedent that had been murdered was Cano Ingram. To counter that, we had several court records. We had a prior indictment that identified by legal name this individual, Antonio Vasquez Pagan, known as Cano Ingram. We proffered to the court local court records from state courts in Puerto Rico, showing that that individual, Cano Ingram, whose legal name was Antonio Vasquez Pagan, was from the exact same area where the murder took place. Those are two pieces of evidence that we had. We brought an opinion from Judge Salvador E. Casellas that referred to Antonio Vasquez Pagan as Cano Ingram. We had the lawyer that represented him and was familiar with the facts of a heist on a Loomis Fargo, I believe it was an armored car, where this individual, Cano Ingram, was involved. There were circumstances in a Rule 104 hearing that really showed that there was plenty of evidence to go to the jury for the jury to make that determination whether it was the same person. In an event where the government failed to even bring an autopsy for Cano Ingram, a death certificate, or even a legal name for this person, we did a lot more than the government to show who he was. Excuse me, counsel, follow-up questions from members of the court? All set, thank you. All right, thank you. We'll hear from Mr. Haase now. Attorney Haase, are you in the meeting? Can you hear us? Attorney Novus, could you please mute your video at this time? Attorney Haase, can you hear us? I'm sorry, Judge. We can see him in the meeting, but he can't seem to hear us, or we're not hearing him. We're going to try and get him back, if that's okay. All right, and I still have a connection to Mr. Novus. I do, too. I think I'm going to remove both of them and see if we can get them to get back into the meeting, and we're just going to ask IT to pause our stream for us while we try and do that. Thank you. Thank you. Please proceed, Mr. Haase. Hello, my name is Attorney Michael Haase. I represent Jose B. Resto-Figueroa, aka Etego, in Appeal Number 18-2265. In this case, Jose Resto-Figueroa was more not a central part of this conspiracy, but he seemed to be a guy that was brought in for one job, as the evidence was a daily participant, but he was brought in for this particular killing of a guy named—a friend of a guy named—a brother of a guy named Orio, who was killed, and they arranged for Pollo's killing. In this case, really, the feeling I get after reviewing the whole matter is that the government, they indeed indicted conspiracy, but they have to look at the conduct of the individuals involved, and they really share that burden to show that each individual's conduct fell within the scope of the overall objectives of the conspiracy, and this becomes a lot more difficult in the case of Etego because he didn't have a lot of these things going on that the other conspirators did, and with this one murder that he was brought in for, and then page 16 in the government's brief, it says that it would be when he showed up to the commission of this murder, which they make a big deal about the preparation, looking for Pollo, banging down the door of his apartment, and somebody else saw him smoking a cigarette in a housing project, and when Mr. Figueroa shows up accompanied with another individual, the guy was already dead, so, I mean, he might have been painted as a person that was a member of the murder, but when it came down to brass tacks and doing the murder, the murder had been already done, and the drive-by conspiracy is where there's preparation by a whole number of different people that seems to be more self-serving than anything else, this evidence made after the commission of this murder when he really didn't have anything to do with the ultimate act, and it's questionable as to what his motives were in terms of advancing the activities of the conspiracy, or was he just doing a favor for a friend named Oreo, whose allegations came up in the case, it was the dispute over a pound of marijuana, not pretty much the objectives of the payment, and there was also a four-track vehicle that was being held in lieu of this payment for the pound of marijuana, so it was more of a private contract deal than an overall membership in the conspiracy, and Mr. Jose Resto Figueroa, an enforcer, enforcing and advancing the objectives of the conspiracy. Based on the evidence presented, the Rule 29 motion should have been granted, because to draw these justifiable inferences, the fair mind could conclude quite differently, and find a reasonable doubt amongst the mosaic of circumstances that the of the drug trafficking organization. The testimony of the witnesses that is relevant to us is Calvino Ramos, Acevedo, Pizarro, really they don't add much to show what what Jose Resto did in terms of advancing the the organization. I thought that Calvino Acevedo testified that Resto was not only a member, but he sold marijuana and crack cocaine at his house, and stored weapons for La Rampa O.N.U. Was that not his testimony? There was some pleading references by him, again that wasn't based on any other evidence than his mention of that, and Calvino was one of the guys that shows up when this witness, the victim, was already dead. Also their expert witness Vidal, the police officer expert witness they called, said that enforcers just don't show up out of nowhere, they're groomed through an organization, and La Rampa should have shown a lot more of a history with Resto Figueroa than having him show up for this one supposed hit, which had already been carried out by somebody else. Didn't they go back to his house after the hit? Yes, and it was made, the government made much ado of the preparation and of the aftermath of that. They failed to really stress the fact that the guy that was already a dead body by the time Jose Resto showed up to do this hit that he was, it was the apex of their evidence against him. But do you need for aiding and abetting, do you need to actually be there when the trigger's pulled? No, but you'd have to be more of a participant in the act than the government showed to be an aider and abetter in a murder. The murder had already been done, I mean a lot of people make the reference that they sure they would like to kill somebody, but that and doing a step to actually doing the killing are quite a bit different. Yes, thank you. Judge Thompson, do you have follow-up questions? No. Judge Kayada? No, I don't. All right, Mr. Hasse, thank you so much, and we'll hear from the government. Good morning, your honors, and may it please the court, Michael Rotker from the Department of Criminal Justice. With respect to the drive-by shooting counts of Mr. Velazquez-Fontanez, let me just briefly address the sufficiency of the evidence of aiding and abetting. To prove aiding and abetting, the government has to prove that the defendant knowingly associated with a venture and sought by his words or actions to bring it about. And the evidence that the court was discussing earlier and that the government presented a trial was certainly sufficient. It showed that Mr. Velazquez-Fontanez placed two phone calls to other members of the conspiracy specifying the whereabouts of the target, and as Judge Kayada pointed out during one of those phone calls, he provided a physical description of the target. If you add to that the fact that he listened to the shooting in real time and then went to the home of the shooters the next day and complimented them on that, certainly didn't act surprised or caught off guard by the fact that there was a shooting here. A rational jury crediting that evidence could clearly find that he was an aider and abetter. With respect to Mr. Resto-Figueroa, your honors just heard from Mr. Hasse, again, if you view the evidence in the light most favorable to the jury's verdict and you draw all the reasonable inferences therefrom, once again you can find not only that he was a second of the two drive-by shooting murders by his conduct beforehand, the preparatory steps, by his conduct in attempting to locate the intended target, going in, knocking on the door, trying to find him, and then by his actions after the fact. On top of that, my opposing counsel mentioned that there was no other real evidence tying Mr. Resto-Figueroa to the conspiracy. There was. As was pointed out by the court, there was evidence that he was involved in selling drugs, that he stored weapons and drugs at his home. Again, a rational jury crediting all that evidence had more than enough of a basis to conclude that he was a member of the conspiracy and that he aided and abetted that drive-by shooting. Unless the court has further questions for me about those two defendants, let me turn to Mr. Cotto-Andino, and of course I'm always happy to jump out of order if the court would so prefer. The argument here this morning was, by my opponent, was based on the idea that the government had a weak case and that we had to resort to what I believe he referred to as showcase evidence, referring to these remote murders. I respectfully disagree with both of those propositions. The government's case was not weak. We had three cooperating witnesses who testified that Mr. Cotto-Andino was a member of La Rompe, and in fact that he owned two of these drug points. And to answer the question that the court raised several times, yes, the murders that we were talking about were related to one of the two drug points that was at issue in this case. It was the same drug point, the Jardinus one. The three cooperators testified that he owned these drug points, that he delegated the day-to-day responsibility for selling drugs 24-7 out of these drug points to his associates, and that in return he was paid what was referred to as rent, or kickback drug proceeds. This is not a weak case at all. That evidence by and large and by itself was enough to prove that he was guilty of the charged crimes. Let me interject right there, because I'm not sure I agree with the proposition you're putting forward. Certainly the cooperating witness testimony, if believed, would have been sufficient. So in that sense it's not fatally weak. But a case that rests almost only on you would describe as strong, and it could be weak in the sense that it's sufficient but hardly compelling. And so that then gets to my concern. You take a case that is predicated on cooperating witness testimony, and then instead of putting in tangible evidence that confirms that testimony, you put in a 15-year-old, two 15-year-old events. You don't limit it to establish the drug points, which I could somewhat see as relevance, but you also want to put in the murder of a person identified solely as Ken O. Ingram. And then when they try to impeach the person by showing that a guy named Ken O. Ingram was killed in a different year, they're not allowed to because the burden somehow put on them to show that the two people are the same. It seems like you're getting far out there, what you're relying on, and then handicapping the defendant from parrying it. I appreciate the question, Your Honor. Let me try to address each of the components of it. I don't think that having three cooperating witnesses who corroborate each other and who testify, I mean, you can have the testimony of one cooperating witness. That can be legally sufficient and that can establish a strong case. When you have three different aspects of Cotto and Dino's role in the conspiracy and corroborating each other, I think it makes out a strong case. We don't believe that the case was weak. The notion, for example, that the evidence of the prior murders was not, my opponent made much of the fact that the government was offering this for propensity purposes, that we were trying to prove, well, he did these bad things in the past, so he must have done them. He must be guilty of these That's not the reason the district court admitted the evidence. Most importantly, the jury was specifically told not once but twice that they could not consider the evidence for that purpose. Why did you need the murder? Of course, you didn't say you were putting it on propensity, but our concern is that the jurors understand it that way, so we ask that it has some other clear relevance. What was the relevance? Not of the fact that he ran drug points, but that he committed these murders. Sure. The relevance was because it bore on his knowledge and intent, and if I could just take a minute to explain how that's so. In order to prove RICO conspiracy liability, the government under Salinas has the burden to prove that a defendant intended to further an endeavor which, if completed, would violate the RICO statute, and to violate the RICO statute, we had to prove that this individual joined a conspiracy knowing and understanding not only that they were engaged in widespread drug dealing in the public housing projects, but also that they used violence as a tool to both obtain and maintain control, or to control their turf, or even to expand their turf. So with that as the legal backdrop, the evidence that these murders were committed is relevant because it bears directly on the fact that he, Mr. Cotto Indino, knew and understood the rules. If you wanted to be a drug dealer in San Juan's public housing projects, you not only had to deal drugs, but you had to acquire the drug points, and violence was often... I'm sorry. Let me see if I understand that. What you're saying is that the fact that he, in running drug points, committed two murders, shows that over 10 years later, when he wanted to join a conspiracy, murder was a part of the conspiracy. Yes, and I would emphasize the same drug points as well, that's critical because, again, the essence of the conspiracy as charged in the indictment, and as laid out by the government at trial, was not just that this was a gang that dealt drugs, it was a gang that dealt drugs and used violence. That was part of the means by which they accomplished their objectives. Mr. Rodker, I'd like to ask you a question about that as well, because I find myself in a box. Perhaps you can help me get out of the box. You said you had a necessary evidence to prove your case, so which is it? I apologize. Let me clarify. I do believe that we had a strong case. I don't think that this evidence was necessary, but I think it was probative and relevant, and certainly bore on legitimate legal issues that the jury had to decide. Remember as well... Doesn't that give you both a 404B prejudice problem, and more importantly, a 403 prejudice problem? No, your honor, not at all. On the 403 point, if I could, let me just a minute and explain. I think the district court went to great lengths to actually minimize any risk of unfair prejudice to Mr. Cotto and Dino. Not only did the court exclude evidence of one of the three, we actually sought to proffer evidence of three murders, and the district court said, no, we're only going to let you put in two. The reason I bring that up is it shows the district court was taking this very seriously. It certainly appreciated that there is a risk of prejudice from this type of evidence, and it wasn't just going to rubber stamp what the government wanted to do. Beyond that, when the government sought to present this evidence, we did so through the non-graphic oral testimony of a single witness that comprised a grand total of 15 pages of the trial transcript out of 2,000 pages, and I want to bring up something that's very important. Cotto and Dino's counsel, in his reply brief, says that the government harped on this evidence in its closing argument before the jury. I am quite sure that if the court hasn't done so already, it will read the record in this case. I have read the government's closing argument five times. There is not a single mention of those murders in our closing argument. In fact, it was Mr. Cotto and Dino that brought up the murders in his closing argument to rhetorically ask, well, why did the government present this evidence? And so in our rebuttal closing, we devoted a grand total of one sentence to explaining, as I just did to the court, that members of the jury, you have heard this evidence, and the reason you have heard it is because it bears on his knowledge and it's like you're trying to judge Howard's box. You haven't at least explained to my satisfaction why you needed the evidence. In fact, you're arguing the opposite, I think. Your Honor, I think that we're entitled to present our case. We presented the three cooperating witnesses, and we felt that their testimony... Well, no, the standard specifically says one of the things the Correct. I mean, you can't ignore that. No, we needed the evidence, but it wasn't dispositive. It's not as though our case... We don't have to prove that our case rose or fell on the evidence. We can put it on as corroborative. We can put it on as additional evidence. That's a need in that sense. It's not need in the sense of absolutely essential or without which you would be subject to a Rule 29. It was corroborative. And in that sense, we had a need for the evidence, and it was certainly probative of the purposes for which we offered it, which were not propensity, but proving knowledge and intent. So I hope that I've tried to give Your Honor a key to help himself out of the box. I don't think that need means absolute essential need. I think it means a legitimate purpose for offering the evidence. And the district court, of course, is... Well, no, it seems to me that there's an obvious difference between those two, relevance and need are different. Well, Your Honor, again, perhaps... I think what I'm really getting at is your argument that you had a strong case without the evidence. You want to stand on that? Yes, Your Honor. I believe that... I mean, I would say this, as I argued in my brief, so I'm not retreating from that. Let's assume as a hypothetical matter that the court were to believe that the remote murder evidence should not have come in at all. I would still submit to you that that error does not require reversal of the judgment because the evidence, the remaining evidence would be sufficient. There's no reasonable likelihood, even if you excise that evidence, there's no reasonable likelihood given the purpose for which the evidence was offered, which was important, but not the only evidence. And given the fact that the jury was told that... Let me emphasize that as well. The district court made very clear to the jury, not only that it was had not been charged with these murders, he was not on trial for these murders, and the jury was not to decide his guilt of those murders. It was a very limited piece of evidence within a much larger mosaic of evidence that proved his guilt. And one of it was hearsay, wasn't it? One of it, the witness didn't even have firsthand knowledge. That's correct, but the district court made a finding that it was a co-conspirator statement, Your Honor, and that's not been appealed. That's not before the court. And then when they tried to say, no, Ken O'Wheaton was killed in a different year, you shouldn't believe this guy, they weren't allowed to do that. Well, first of all, they were allowed extensive latitude to impeach the witness regarding his inconsistent recollection of the year of the murder. He said 93, he said 95, he said 96, he said the mid-1990s. There was an ample foundation for the defense to argue that the witness's testimony was not credible. As far as the specific testimony that was proffered by the lawyer, as Your Honor himself pointed out, it's not that they had the burden, that we weren't shifting any burden, but they were the ones that were proposing this evidence. And before it could be admitted, they had to at least lay a foundation for someone to be able to make a finding that the Ken O'Ingram that they were referring to is the same Ken O'Ingram that was murdered. Why is that? I mean, in the middle of a case, you flop in these 15-year-old murders, murder, and your witness identifies him only by the name Ken O'Ingram. Right. And they know there's another guy, Ken O'Ingram, who's still killed in different circumstances in a different year, and they want to put that in. And then you say, well, because we didn't put in the guy's non-nickname, you can't. I mean, it seems, and meanwhile, we're letting it in as conspiracy evidence in some other conspiracy. Right. It seems like a lot of, very little leeway is being given to the defendant to respond to some pretty major prejudicial testimony. I appreciate the question, Your Honor. I do think the record shows that the district court did give him extensive leeway to impeach on this specific issue. As far as the point about Ken O'Ingram, yes, there was no specific evidence presented as to his actual name, but given what we had to work with, given Ken O'Ingram, given the fact that it's a street nickname, the defense has to come forward if they want to put on this evidence to show that it was in fact the same person. The district court held a 104 hearing outside the jury's presence. It made a finding that there was not a sufficient foundation. That's a factual determination that it's not clearly erroneous, and therefore it wasn't an abuse of discretion to exclude that, particularly given the latitude that the court gave defense counsel to impeach the witness regarding his inconsistent recollection. So I respectfully disagree. I think that the district court should be held to account for the lack of latitude. On the question about the hearsay point, though, I do want to just reiterate for the record, that issue has not been properly raised before the court. It was raised below. It was one of many objections that was raised by the defense, but they did not argue the point in their opening brief. It goes to the weakness. I mean, it's a 15-year-old hearsay testimony that some guy named Ken O'Ingram died in certain circumstances, and oh, you can impeach, but only by questioning him. You can't bring in evidence that the same name was killed in some other circumstances. That doesn't sound like someone's trying to be particularly protective of the defendant. Well, respectfully, I think that the court was, and all I'm saying on the hearsay point is if the defense disagreed with the admission of this hearsay statement, they had every right and every opportunity and every ability to reply briefly and say, oh, the government didn't address this point. You have to brief the issue. The district court made findings. We could have briefed it and explained why we think the evidence is admissible, why we think it's reliable, why we think it's trustworthy, and why there was no error, and I just don't think that it's properly before the court. I don't think the court's precedents will allow when there's been inadequate presentation of the issue. So our position is that it was not error, and as far as the remoteness of the murders, I would emphasize, as we pointed out in our brief, under this court's decision in fields, there is no firm temporal cutoff date, and the district court is best positioned to decide for itself to weigh the probative value, to balance that against the prejudice, and to make those sensitive determinations. This court traditionally gives the district court great leeway and broad discretion. It's not unlimited, but it's quite broad, and I think if you look at the record as a whole, if you look at all steps the district court took to safeguard Cato Andino's rights and to protect him against any risk of unfair prejudice, I think what you'll see is that the limiting instructions, which were given both during the trial and in closing, you look at the curative instructions that were given about what the permissible uses of the testimony were, you look at the fact that this evidence was not going to shock the jury, okay? It was 15 pages, non-graphic, non-descriptive, compared to the shooting murders, which were graphic and gory and gruesome. I don't think the jury was going to be unduly swayed by hearing this evidence, and so the idea that this was the showcase of our case, I simply think that the record belies that claim, and I'm confident that when the court goes back and rereads the record, you will reach the same conclusion as well. According to my clock, I have about two minutes remaining. I'm more than happy to answer any questions the court has, but if not, we would respectfully urge the court to affirm the all. Thank you, Your Honor. That concludes the arguments in this case. Attorney Ramirez, Attorney Novus, Attorney Hasse, and Attorney Rotker, you should disconnect from the hearing at this time.